# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| SHAWON JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19-CV-1186 CDP |
| | ) | |
| TRAVIS CREWS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court upon the motion of plaintiff Shawon Jones (registration no. 1254397), an inmate at Eastern Reception, Diagnostic and Correctional Center ("ERDCC"), for leave to commence this action without payment of the required filing fee. For the reasons stated below, the Court finds that the plaintiff does not have sufficient funds to pay the entire filing fee and will assess an initial partial filing fee of $7.61. *See* 28 U.S.C. § 1915(b)(1). Furthermore, after reviewing the complaint, the Court will partially dismiss the complaint and will order the Clerk to issue process or cause process to be issued on the non-frivolous portions of the complaint.

## 28 U.S.C. § 1915(b)(1)

Pursuant to 28 U.S.C. § 1915(b)(1), a prisoner bringing a civil action in forma pauperis is required to pay the full amount of the filing fee. If the prisoner has insufficient funds in his or her prison account to pay the entire fee, the Court must assess and, when funds exist, collect an initial partial filing fee of 20 percent of the greater of (1) the average monthly deposits in the prisoner's account, or (2) the average monthly balance in the prisoner's account for the prior six-month period. After payment of the initial partial filing fee, the prisoner is required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's

account. 28 U.S.C. § 1915(b)(2). The agency having custody of the prisoner will forward these monthly payments to the Clerk of Court each time the amount in the prisoner's account exceeds $10, until the filing fee is fully paid. *Id.*

Plaintiff has submitted an affidavit and a certified copy of his prison account statement for the six-month period immediately preceding the submission of his complaint. A review of plaintiff's account indicates an average monthly deposit of $38.05. Plaintiff has insufficient funds to pay the entire filing fee. Accordingly, the Court will assess an initial partial filing fee of $7.61.

## 28 U.S.C. § 1915(e)

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss a complaint filed in forma pauperis if the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. An action is frivolous if it "lacks an arguable basis in either law or fact." *Neitzke v. Williams,* 490 U.S. 319, 328 (1989); *Denton v. Hernandez,* 504 U.S. 25, 31 (1992). An action is malicious if it is undertaken for the purpose of harassing the named defendants and not for the purpose of vindicating a cognizable right. *Spencer v. Rhodes,* 656 F. Supp. 458, 461-63 (E.D.N.C. 1987), *aff'd* 826 F.2d 1059 (4th Cir. 1987). A complaint fails to state a claim if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

To determine whether an action fails to state a claim upon which relief can be granted, the Court must engage in a two-step inquiry. First, the Court must identify the allegations in the complaint that are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-51 (2009). These include "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Id.* at 1949. Second, the

Court must determine whether the complaint states a plausible claim for relief. *Id.* at 1950-51. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. The plaintiff is required to plead facts that show more than the "mere possibility of misconduct." *Id.* The Court must review the factual allegations in the complaint "to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951. When faced with alternative explanations for the alleged misconduct, the Court may exercise its judgment in determining whether plaintiff's proffered conclusion is the most plausible or whether it is more likely that no misconduct occurred. *Id.* at 1950, 1951-52.

## The Complaint

Plaintiff, an inmate currently incarcerated at ERDCC, brings this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights relating to an incident that occurred while plaintiff was incarcerated at Potosi Correctional Center ("PCC"). Plaintiff brings this action against twenty-four (24) defendants: Travis Crews (Assistant Warden, PCC); Jennifer Price (Functional Unit Manager); John Doe Hunter (Major); John Doe Menteer (Captain); Jeffrey Turner (CSI); Tracey Price (Lieutentant); John Parson (Sergeant); Christine Mezo (Sergeant); Christine Henson (Sergeant); John Dayton Richey (Sergeant, Cell Extraction Team ("CERT Team") Member); Kyle Kershaw (Sergeant, CERT Team Member); Jane Doe Skaggs (Sergeant)[1]; Charles Conrad (CERT Team Member); Steven Brook (CERT Team Member); Jeremiah Kitchell (CERT Team Member); John Doe Demeart (CERT Team Member); John Doe Mesberg (CERT Team Member); John Doe Bertlesmeyer (CERT Team Member); Amber Rayfield-Davis (Correctional Officer); Timothy Poole (Correctional Officer); Jeffrey Jones (Case Manager); Tracy Dunn (Nurse); Robin Billin (Nurse); and Daly Smith (Director of

---

[1] Plaintiff states that this defendant is called "John Doe Skaggs," but he refers to this individual as a "her" in the Statement of Facts. The Court will therefore refer to this defendant as Jane Doe Skaggs.

Nursing). Plaintiff claims that he is suing defendants in both their individual and official capacities.

Plaintiff asserts that on March 12, 2018, he was incarcerated at PCC in the TCU wing. Plaintiff states that he was on "suicide watch" and under camera surveillance. Plaintiff claims that around noon, a Cell Extraction Team came to his cell door. Plaintiff does not indicate which members of the CERT Team were at his cell door on March 12, 2018. Rather, he states that he was not given any directives at that time by the CERT Team members.

Plaintiff states that he was "balled up in the corner" of the cell because he was cold. He claims that CERT Team member Kyle Kershaw unlocked the cell door and grabbed him from the cell floor by his head, which pulled several dreadlocks from his head.

Plaintiff alleges that at the same time, defendant John Dayton Richey screamed at plaintiff, "stop resisting." He claims that Richey also punched him in the mouth, causing damage to his gums and lips.

Plaintiff states that at this point he dropped to the cell floor and CERT Team member Steven Brook pushed his knee into plaintiff's head, between his temple and ear. Plaintiff asserts that John Parson was overseeing the CERT Team at the time. [2]

Plaintiff states that at this point, he was escorted from his cell into housing unit 2B-Cell #6, a non-suicide cell. He alleges that he asked CERT Team member Charles Conrad what was going on, and Conrad purportedly told plaintiff that "it was a targeted hit" designed by the Warden as a result of too many offenders declaring that they were suicidal. Allegedly, Conrad

---

[2]At different points throughout his complaint, plaintiff asserts in a conclusory fashion that members of the CERT Team who **might have been** at the site of the alleged excessive force should be liable for either failure to protect or failure to report the alleged unlawful conduct. Plaintiff's allegations are too conclusory to form a constitutional violation as stated. *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) (stating that "the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations").

told plaintiff that he had been called in on his day off and told to take five inmates from the suicide cells and place them in housing Unit 2.

Plaintiff claims that he was still on "suicide watch," as he was strip searched and "left with nothing." However, he simply was not in a suicide cell. He claims that after about an hour passed, Nurse Tracy Dunn approached his cell and asked what was going on. Plaintiff purportedly told her that his mouth was bleeding and turned his head right to show her the left side of his face. Plaintiff complains that Dunn told him that he "was not going to die" and walked away. He states that he was left in his cell, naked, with no clothing due to being on suicide watch. He claims that he should have been given a smock, but that the CERT Team had taken the one he had.

Plaintiff states that on March 13, 2018 (the next day), Caroline Pope (Chief of Mental Health), approached his cell and spoke with him and told plaintiff that she would be taking plaintiff off suicide watch. Plaintiff claims he told Pope that he was naked, didn't have working water in his cell, and needed medical attention. Pope told plaintiff she would look into it.

Plaintiff claims that when Christine Henson, the Sergeant, was conducting rounds, he spoke with her about the issues he discussed with Caroline Pope. Plaintiff states that Henson told him that he was off suicide watch but couldn't receive property due to the incident the prior day, and that she was waiting for special security orders from the Functional Unit Manager and Warden.

Plaintiff states that around noon he activated the sprinkler head in his cell because he wanted to wash the blood off his body from the prior day. Attached to plaintiff's complaint is a conduct violation report written by Christine Henson relating to this incident. Henson states:

> On [March 13, 2018], Offender Jones, Shawon #1254397 busted his sprinkler head in his cell 2-B-6 causing it to break and spray an undetermined amount of water throughout the wing and the cell. This resulted in maintenance staff having to cap the sprinkler head and replace it.

By his own actions Offender Jones places himself in violation of Rule 19.1 Creating a Disturbance, 20.1 Disobeying an Order and 31.1 Destroying Property. Note: It was determined by Fire and Safety Personnel Gary Phegley that the cost for the sprinkler head replacement is $125.00 and clean up is $40.00. This would total $165.00.

Plaintiff states that this was the only running water in his cell for three days.

On Wednesday, March 14, 2018, plaintiff was given special security orders indicating that whenever he was being fed, being given medicine or escorted there would have to be two correctional officers with him and he would have to wear hinge handcuffs, ankle-cuffs, elbow-cuffs and a tether. Plaintiff states that the security orders indicated that he would not be allowed property except for a paper smock and brown bag meals, including two sandwiches, a coke or cookie.

Plaintiff claims that on April 5, 2018, he was "assaulted with a chemical agent," by Correctional Officer Mezo. The Court presumes plaintiff is referring to the use of mace. He claims that Nurse Robin Billin assessed him after this time period, and he was complaining about chest pain due to having chronic lung disease but Nurse Billin stated that there was nothing else she could do for plaintiff at that time. Plaintiff does not indicate whether he could wash off after he was "assaulted with a chemical agent."

On Tuesday, April 10, 2018, plaintiff alleges, he was for the first time given a toothbrush and toothpaste under the security orders by Correctional Officer Amber Rayfield-Davis. Plaintiff states that Rayfield-Davis said she was providing the toothpaste and toothbrush under orders from the Functional Unit Manager, Jennifer Price. Plaintiff states that he only had one pair of boxers at this time.

Plaintiff states that on April 13, 2018, he declared himself a suicide risk. He states that he had lost three close relatives and he was also suffering from the added pressure of visitors being denied per Captain John Doe Menteer and Correctional Officer Amber Rayfield Davis. Plaintiff

states that when he declared himself a suicide risk, the CERT Team was assembled to extract him from his cell, consisting of Jeremiah Kitchell, Correctional Officer John Doe Demeart, Correctional Officer John Doe Bertelsmeyer, Correctional Officer John Doe Mesberg and another John Doe Correctional Officer whose name plaintiff is unable to recall.

Plaintiff states that when the CERT Team approached his cell Sergeant Jane Doe Skaggs, who was there overseeing the CERT Team, told plaintiff to submit to the restraints. Plaintiff was told to lay on his stomach with his arms and legs stretched outwards. Plaintiff states that he refused to comply "due to the last incident."

Plaintiff states that defendant Skaggs waved her arm to indicate that the cell door should be opened. When the door was opened, plaintiff claims that he tried to "run out the cell," but he states that he was repeatedly punched in the head and facial area by defendant Kitchell. Plaintiff states that when the cell door was completely open he was "trapped with force," and at least four (unnamed) CERT Team members physically battered him. Plaintiff does not state which of the CERT Team members were responsible for allegedly battering him in the cell. However, he does state that eventually he succumbed to the handcuffs and ankle-cuffs and was escorted out of his cell. Plaintiff also states that the entire incident was videotaped by a correctional officer.

Attached to plaintiff's complaint is a conduct violation report signed by defendant Kitchell stating:

> [he] was a member of the five man movement team on April 13, 2018, and Offender Jones acted in a combative and aggressive manner. During this incident Offender Jones spit a mixture of saliva and blood that struck [him] in the eye and facial area.

Plaintiff was given a conduct violation for assault as a result of his actions relating to his behavior.

Plaintiff states that he had blood coming out of his head and facial area, and it was eventually decided that he would be taken to medical to be looked at rather than be taken to his

cell. He alleges that in medical he was examined by Nurses Robin Billin, Jamie Vester, Connie Barton and Daly Smith. Plaintiff also believes two other nurses also examined him.

Plaintiff alleges that the nurses cleaned the blood from his face and head with an antiseptic solution. A laceration on his nose was cleaned, as well as one on his eye and ear. He was then escorted back to his cell in 2B.

Plaintiff alleges that his conditions of confinement in his cell in 2B were constitutionally inadequate under the Eighth Amendment. He states that the concrete slab plaintiff slept on had dirt on it. Plaintiff also complains that the toilet and sink area also had dirt and "feces" stuck inside the toilet bowl. Plaintiff states that for three days the cell did not have running water except for the sprinkler water he turned on.

Plaintiff alleges that Nurse Tracy Dunn failed to provide him with adequate medical care when she walked away from his cell on March 12, 2018 and told him that he wasn't going to die. He also claims that Nurse Billin denied him adequate medical care when she told him that there was nothing else she could do for him after she assessed him when he was maced by Correctional Officer Mezo. Last, plaintiff states that after he was purportedly assaulted by the CERT Team on April 13, 2018, Director of Nursing Daly Smith, Nurse Billin, Connie Barton and Jamie Vester all failed to provide plaintiff with pain medical for his injuries. Plaintiff further states that they also failed to pull him out for sick call at the directives of Functional Unit Manager Jennifer Price and Captain John Doe Menteer.

Plaintiff states that he was given inadequate food between March 12, 2018 and April 18, 2018, consisting of a brown bag diet, which was 2 peanut butter and jelly sandwiches and a cupcake or pack of cookies with juice or water. Plaintiff claims this was issued by defendant Turner or defendants Price or Menteer.

Plaintiff also claims that he was also given inadequate clothing between March 12, 2018 and April 18, 2018, consisting of one pair of boxers. He alleges that on April 18, 2018, he was given a t-shirt and socks, but it was taken by defendant Menteer on an unspecified date by "orders of the CERT Team."

Plaintiff additionally asserts that there was "inadequate furnishings" in his cell. He claims that he had no mattress, no sheets, no blanket and he was subjected to "harsh conditions." He claims that the cell was colder than normal because it was still "winter," and he was forced to sleep on concrete without a mattress or blanket. Although plaintiff blames defendants Price, Menteer Hunter and Turner for the conditions of confinement, he does not indicate who gave the orders to deprive plaintiff of furnishings in his cell.

Plaintiff alleges that his legal materials, as well as paper and stamps, were withheld between March 12, 2018 and April 18, 2018. He asserts that defendant Jones denied plaintiff his legal materials. Plaintiff claims that additionally, his mail was withheld during this time period, and it was provided to him when he was taken off of suicide watch.

Plaintiff asserts that he was denied visits with his family as a result of "special security orders" for destruction of property. He claims that his family informed him that they were told by Functional Unit Manager Price of the denial. Plaintiff speculates in a conclusory manner that the visits were denied by Price, Hunter, Turner and Menteer.

Plaintiff asserts that "in mid-May [he] tried to file several IRRs about the conditions of confinement in the SSO's to no avail." He claims that J. Jones chose to file two different IRRs for plaintiff but would not process the IRRs on excessive force or on the conditions at the special security orders. He alleges that it wasn't until he was assigned a new caseworker that he was able

to file the appropriate IRRs.[3] Plaintiff has provided the Court with a copy of a grievance response indicating that there were, in fact, two grievances that were unfortunately not processed by the Missouri Department of Corrections in a timely manner. The grievance response notes that the response provided at the IRR level on August 10, 2018, encouraged plaintiff to utilize the IRR process for any complaints which he had regarding the processing of his IRRs. The grievance response noted that in the nearly sixty days after that time, plaintiff had not pursued any old issues and a new case manager had been assigned to plaintiff's housing unit.

Plaintiff asserts that he was denied the ability to practice his unnamed religion, as well as his unnamed certified religious diet, between March 13, 2018 and April 18, 2018.

Last, plaintiff makes a procedural due process claim with relation to being placed on special security assignment on June 21, 2018. He alleges in a conclusory manner that Jennifer Price placed him on special security assignment, without a hearing or notice.

The response to plaintiff's informal resolution request regarding the special security orders states that plaintiff was placed on administrative confinement due to his behavior. The response states that the decision was made collectively between "Administrative, Custody, Classification, and Mental Health Personnel." The response states that the orders are "constantly reviewed by Administrative (Warden) and Mental Health Contract Monitors to ensure due process and MODOC policies and procedures were not violated." The response is signed by an Acting Functional Unit Manager, the Assistant Warden and an Investigating Staff Manager.

In the grievance response, Warden Richard Jennings states that plaintiff's assignment to administrative segregation, or special security assignment, was reviewed with respect to Missouri Department of Corrections Guidelines, and it was recommended upon a "collective

---

[3]Plaintiff has attached several IRRs, grievances, grievance responses, grievance appeals, and grievance appeal responses to his complaint. The Court will review these documents as part of the complaint in compliance with Fed.R.Civ.P.10(c).

assessment of mental health, classification, custody and administrative staff." And in the grievance appeal response, Deputy Division Director, Jeff Norman, indicated that the special security orders were issued as a result of plaintiff's "maladaptive behavior." Conduct violation records indicated that plaintiff received nine conduct violations in 2018, two of which were for assault and two for threats.

With relation to his "special security assignment" after his move to housing unit 2B, plaintiff states that he was subject to "atypical hardship" for three days in his cell in 2B housing unit because he was naked. Plaintiff alleges that the next thirty (30) days in 2B he lacked furnishings in his cell, didn't have basic hygiene items, was forced to eat bag lunches and he wasn't allowed to shower. He states that this caused him intentional infliction of emotional distress, but he doesn't allege which particular defendant is responsible for such distress.

Plaintiff seeks monetary damages in this action.

### Discussion

**A. Excessive Force Claim on March 12, 2018**

Plaintiff's first claim of excessive force relates to the incident on March 12, 2018, when the CERT Team came to his cell door to extract him from "suicide watch" and take him to a new cell in 2 House.

Plaintiff has not identified exactly which members of the CERT Team came to his cell door, nor has he told the Court whether any directives were given to him by the CERT Team relative to his extraction from his cell. He states that at the time of the extraction he was "balled up in the corner" of the cell because he was cold, but it is logical to surmise that the CERT Team had to have given plaintiff an instruction to cuff up rather than remain in the corner of his cell.

He claims that CERT Team member Kyle Kershaw unlocked the cell door and grabbed him from the cell floor by his head, which pulled several dreadlocks out, while at the same time

defendant John Dayton Richey screamed at plaintiff, "stop resisting." He claims that Richey also punched him in the mouth, causing damage to his gums and lips.

Plaintiff states that at this point he dropped to the cell floor and CERT Team member Steven Brook pushed his knee into plaintiff's head, between his temple and ear, presumably to restrain plaintiff so that he could be cuffed, although plaintiff does not state why he was restrained in this manner. Plaintiff asserts that John Parson was overseeing the CERT Team at the time.

Plaintiff's official capacity claims against defendants Kershaw, Richey, Brook and Parson are subject to dismissal, as these defendants are employed by the Missouri Department of Corrections ("MDOC") which is an agency of the State of Missouri. Naming a government official in his or her official capacity is the equivalent of naming the government entity that employs the official. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). "[N]either a State nor its officials acting in their official capacity are 'persons' under § 1983." *Id.* Thus, plaintiff's claims for damages against all of the defendants as to claims in their official capacities for excessive force on March 12, 2018 are subject to dismissal.[4]

Plaintiff has also sued defendants Kershaw, Richey, Brook and Parson in their individual capacities for excessive force on March 12, 2018.

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). In the context of a prisoner's Eighth Amendment claim against a prison guard for the use of excessive force, "the core judicial inquiry

---

[4] It does not appear that plaintiff is seeking injunctive relief in this matter. Even if he was seeking equitable or injunctive relief, such relief would be moot because he has been transferred from the institution where the alleged violation occurred. *See Sossamon v. Texas,* 563 U.S. 277, 304 (2011), *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985).

is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6.

While an inmate need not have suffered a serious injury in order to maintain an Eighth Amendment claim, the extent of the injury is one factor to be considered in determining whether the use of force was wanton and unnecessary. *Id.* Not every malevolent touch by a prison guard gives rise to a federal cause of action. *Id.* at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")). The "Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10.

In the instant complaint, plaintiff alleges his dreadlocks were pulled by defendant Kershaw in order to remove him from the corner, he was punched in the mouth by defendant Richey and told to stop resisting, and defendant Brook pushed his knee into plaintiff's head. Given that plaintiff admits that he was crouching in the corner of his cell at the time the CERT Team entered his cell for the extraction rather than allowing himself to be cuffed when the CERT Team entered the cell, the Court cannot say that defendant Kershaw acted maliciously and sadistically in attempting to remove plaintiff from the corner by grabbing him by the head. The unfortunate removal of some of plaintiff's dreadlocks in the process of grabbing plaintiff's head is simply a de minimis injury.

Similarly, it appears that defendant Brook's actions of pushing his knee into plaintiff's head in order to restrain him so that he could be cuffed before removal from his cell can also not be categorized as an unnecessary use of force. Although plaintiff claims that he asked for medical treatment for his purported head injury following the incident, the facts are that a nurse

looked at the side of his head through the cell and indicated to plaintiff that he looked fine. *See Hudson*, 503 U.S. at 9-10 (explaining that an "inmate who complains of a push or shove that causes no discernible injury almost certainty fails to state a valid excessive force claim"); *Askew v. Millerd*, 191 F.3d 953, 958 (8th Cir. 1999) ("Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability under it.").

However, from the facts as alleged, the Court will issue process on plaintiff's claims of excessive force against defendant Richey, in his individual capacity, for wantonly punching plaintiff in the mouth, doing damage to his lips and gums.

Nonetheless, the complaint fails to state a claim against defendant Parson, because plaintiff has not alleged that Parson was directly involved in or personally responsible for violating his rights. "Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990); *see Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). It appears plaintiff has included Parson in this lawsuit because he holds an administrative or supervisory position. However, a *respondeat superior* theory is inapplicable in § 1983 cases. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).

**B. Excessive Force Claim on April 5, 2018**

Plaintiff claims that on April 5, 2018, he was "assaulted with a chemical agent," by Correctional Officer Mezo. The Court presumes plaintiff is referring to the use of mace. He claims that Nurse Robin Billin assessed him after this time period, and he was complaining about chest pain due to having chronic lung disease but Nurse Billin stated that there was nothing else she could do for plaintiff at that time. Plaintiff does not indicate whether he could wash off after

he was "assaulted with a chemical agent, nor does he explain the factual circumstances surrounding defendant Mezo's use of mace.

As noted above, the test is whether the officer's use of force was reasonable under the circumstances, or whether it was punitive, arbitrary, or malicious.  *See Hudson v.* 503 U.S. at 5.; *Whitley,* 475 U.S. at 319.  A basis for an Eighth Amendment claim exists when an officer uses pepper spray without warning on an inmate who poses no threat.  *See Foulk v. Charrier*, 262 F.3d 687, 691-92 (8th Cir. 2001); *see also Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir.2006) ("An application of pepper spray when an inmate is being compliant can provide a basis for an Eighth Amendment claim."); *Treats v. Morgan*, 308 F.3d 868, 873 (8th Cir. 2002) ("A basis for an Eighth Amendment claim exists when . . . an officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat."); *Lawrence v. Bowersox*, 297 F.3d 727, 730-32 (8th Cir. 2002) (correctional officer violated Eighth Amendment by ordering use of pepper spray on inmates who had questioned his command).

Plaintiff cannot bring a claim against defendant Mezo in her official capacity because defendant Mezo is employed by MDOC which is an agency of the State of Missouri. Naming a government official in his or her official capacity is the equivalent of naming the government entity that employs the official.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). "[N]either a State nor its officials acting in their official capacity are 'persons' under § 1983." *Id.*  Thus, plaintiff's claims for damages against defendant Mezo as to the claim against Mezo in her official capacity for excessive force on April 5, 2018 is subject to dismissal

As to plaintiff's claim against defendant Mezo for excessive force in her individual capacity, it is also subject to dismissal. Plaintiff's complaint lacks any factual information

regarding the use of force by defendant Mezo, therefore the Court is unable to find a basis for an Eighth Amendment claim in this instance.

### C. **Excessive Force Claim April 13, 2018**

Plaintiff states that on April 13, 2018, he declared himself a suicide risk. He states that he had lost three close relatives and he was also suffering from the added pressure of visitors being denied per Captain John Doe Menteer and Correctional Officer Amber Rayfield Davis.

Plaintiff states that when he declared himself a suicide risk, the CERT Team was assembled to extract him from his cell, consisting of Jeremiah Kitchell, Correctional Officer John Doe Demeart, Correctional Officer John Doe Bertelsmeyer, Correctional Officer John Doe Mesberg and another John Doe Correctional Officer whose name plaintiff is unable to recall.

Plaintiff states that when the CERT Team approached his cell Sergeant Jane Doe Skaggs, who was there overseeing the CERT Team, told plaintiff to submit to the restraints. Plaintiff was told to lay on his stomach with his arms and legs stretched outwards. Plaintiff states that he refused to comply "due to the last incident."

Plaintiff states that defendant Skaggs waved her arm to indicate that the cell door should be opened. When the door was opened, plaintiff claims that he tried to "run out the cell," but he states that he was repeatedly punched in the head and facial area by defendant Kitchell. Plaintiff states that when the cell door was open he was "trapped with force," and at least four (unnamed) CERT Team members physically battered him. Plaintiff does not state which of the CERT Team members were responsible for allegedly battering him in the cell. However, he does state that eventually he succumbed to the handcuffs and ankle-cuffs and was escorted out of his cell. Plaintiff also states that the entire incident was videotaped by a correctional officer.

Attached to plaintiff's complaint is a conduct violation report signed by defendant Kitchell stating:

> [he] was a member of the five-man movement team on April 13, 2018, and Offender Jones acted in a combative and aggressive manner. During this incident Offender Jones spit a mixture of saliva and blood that struck [him] in the eye and facial area.

Plaintiff was given a conduct violation for assault as a result of his actions relating to his behavior.

Plaintiff states that after the incident he had blood coming out of his head and facial area, and it was eventually decided that he would be taken to medical to be looked at rather than be taken to his cell.

Plaintiff's official capacity claims against defendants Kershaw, Richey, Brook and Parson are subject to dismissal, as these defendants are employed by the Missouri Department of Corrections ("MDOC") which is an agency of the State of Missouri. Naming a government official in his or her official capacity is the equivalent of naming the government entity that employs the official. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). "[N]either a State nor its officials acting in their official capacity are 'persons' under § 1983." *Id.* Thus, plaintiff's claims for damages against defendants as to claims in their official capacities for excessive force on April 13, 2018 are subject to dismissal.

Plaintiff has also sued defendants in their individual capacities for excessive force on April 13, 2018.

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). In the context of a prisoner's Eighth Amendment claim against a prison guard for the use of excessive force, "the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6.

While an inmate need not have suffered a serious injury in order to maintain an Eighth Amendment claim, the extent of the injury is one factor to be considered in determining whether the use of force was wanton and unnecessary. *Id.* Not every malevolent touch by a prison guard gives rise to a federal cause of action. *Id.* at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973) ("not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")). The "Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10.

Plaintiff admits that rather than follow the directives of defendant Skaggs to submit to the restraints, he ran out of the cell door into the arms of the CERT Team as soon as the cell door opened. He cannot now assert that the CERT Team's use of force to get him to submit to the restraints is excessive without specific allegations against each particular defendant.

Plaintiff fails to articulate specific allegations of force against defendants John Doe Demeart, Correctional Officer John Doe Bertelsmeyer, Correctional Officer John Doe Mesberg and another John Doe Correctional Officer whose name plaintiff is unable to recall. Thus, plaintiff's allegations of force against these defendants are subject to dismissal.

Similarly, the complaint fails to state a claim against defendant Skaggs, because plaintiff has not alleged that Skaggs was directly involved in or personally responsible for violating his rights. "Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990); *see Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). It appears plaintiff has included Skaggs in this lawsuit

because he holds an administrative or supervisory position. However, a *respondeat superior* theory is inapplicable in § 1983 cases. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).

However, the Court will issue process on plaintiff's claims for excessive force against defendant Kitchell, in his individual capacity, for his involvement in the incident on April 13, 2018. Plaintiff claims that he was repeatedly punched in the head and facial area by defendant Kitchell during the removal from his cell on April 13, 2018. This is enough to allow for issuance of process on an Eighth Amendment claim in defendant's individual capacity.

### D. Denial of Medical Care Claims

Plaintiff asserts four separate instances where he was purportedly denied medical care at the prison. He asserts that on March 12, 2018, Nurse Tracy Dunn reviewed his mouth and left side of his face and allegedly told plaintiff "he was not going to die" and walked away. He claims that on April 5, 2018, Nurse Billin told him there was nothing she could do for him after he was maced by defendant Mezo. Plaintiff claims that on April 13, 2018, Nurse Daly Smith, Nurse Billin, Nurse Barton and Nurse Vester allegedly failed to provide plaintiff assistance with pain medicine for his injuries. And he claims that he was not pulled out for sick call at the directives of Jennifer Price and defendant Menteer. The Court has reviewed each of these instances and found that none of the aforementioned allegations rise to the level of an Eighth Amendment violation.

The government has an obligation to provide medical care to those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To demonstrate constitutionally inadequate medical care, the inmate must show that a prison official's conduct amounted to deliberate indifference. *Dulany v. Carnahan*, 132 F.3d 1234, 1237-38 (8th Cir. 1997).

To prevail on an Eighth Amendment claim of deliberate indifference, a plaintiff must prove that he suffered from an objectively serious medical need, and that prison officials actually

knew of and disregarded that need. *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019). "A

serious medical need is one that has been diagnosed by a physician as requiring treatment, or one

that is so obvious that even a layperson would easily recognize the necessity for a doctor's

attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). Deliberate indifference can

include the intentional denial or delay of access to medical care, or the intentional interference

with treatment or prescribed medication. *Vaughn v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995).

However, a showing of deliberate indifference requires more than a mere disagreement with

treatment decisions and is greater than gross negligence. *Gibson v. Weber*, 433 F.3d 642, 646 (8th

Cir. 2006).

Plaintiff's facts establish that, for the March 12, 2018 incident, observing him through the

window of the cell door, Nurse Dunn told plaintiff that he did not need medical attention. At that

time, plaintiff states that he had a bloody lip and a bruise on his head. Although plaintiff may

have disagreed with Nurse Dunn's pronouncement, a mere disagreement with her medical

opinion is not enough to rise to deliberate indifference under the statute.

For the April 5, 2018 incident, Nurse Billin told him there was nothing she could do for

him after he was maced by defendant Mezo. As noted above, plaintiff has not shared with the

Court the facts surrounding how he was maced, or what occurred after he was maced, such as if

he was allowed to flush his eyes and mouth. Thus, the Court is unable to state whether Nurse

Billin made an accurate statement when she told plaintiff there was nothing she could do for him

after he was maced. As plaintiff's factual statement is lacking in this instance, the Court cannot

state that Nurse Billin acted with deliberate indifference with respect to plaintiff on this occasion.

With respect to the April 13, 2018 incident, he asserts that none of the nurses at medical

would provide plaintiff with pain medication. For a claim of deliberate indifference, "the

prisoner must show more than negligence, more even than gross negligence, and mere

disagreement with treatment decisions does not rise to the level of a constitutional violation."

*Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

As for plaintiff's claims that he was not pulled out for sick call at the directives of Jennifer Price and defendant Menteer, plaintiff has also failed to provide the Court with facts relative to this claim. Plaintiff has not indicated what he requested sick call for, or what his serious medical need was at the time he was requesting sick call. Thus his claim fails for this reason.

### E. Access to Courts Claim/Withholding of Mail Claim

Plaintiff alleges that his legal materials, as well as paper and stamps, were withheld between March 12, 2018 and April 18, 2018 during his time in administrative segregation in housing 2B. He asserts that during this time he was also denied legal materials by defendant Jones. Plaintiff claims that additionally, his mail was withheld during this time period, and it was provided to him when he was taken off of suicide watch.

Plaintiff's claims arise under the First Amendment, which guarantees inmates the right to send and receive mail. *Turner v. Safely,* 482 U.S. 78, 89 (1987), *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998). To state a facially-plausible claim, a plaintiff must plead facts permitting the reasonable inference that the defendant is liable for the misconduct alleged, *Iqbal,* 556 U.S. at 678, and to raise the right to relief above the speculative level. *Twombly,* 550 U.S. at 555.

Even if it could be said that plaintiff's factual allegations permitted the inference that prison officials were liable for not always delivering all of his mail, plaintiff's allegations establish only sporadic disruptions that are not the result of content-based prison regulations or practices, allegations that are insufficient to support a First Amendment claim. *See Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2000) ("Allegations of sporadic and short-term delays and

disruptions are insufficient to state a cause of action grounded upon the First Amendment");

*Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999) (allegations of sporadic and short-term

disruptions in mail that are not the result of a content-based prison regulation or practice do not

state a First Amendment claim); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (to state a

claim under the First Amendment, a plaintiff must show a regular and unjustifiable interference

with mail).

      Plaintiff also references not receiving responses to mail he identifies as "legal" mail.

However, he offers no allegations tending to establish he suffered an "actual injury" as required

to state a plausible claim premised upon his right of access to the courts. *See Lewis v. Casey*, 518

U.S. 343, 351-52 (1996), *Sabers v. Delano*, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam).

      To the extent plaintiff can be understood to claim he was wrongfully denied mail

privileges during the approximate month he was held on suicide watch and administrative

segregation, such allegations do not establish a constitutionally-protected liberty interest as

necessary to state a cognizable due process claim. *See Kennedy v. Blankenship,* 100 F.3d 640,

642-43 (8th Cir. 1996) (no "liberty interest" implicated by thirty days in punitive isolation that

included suspension of mail privileges), *Beaulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir.

2012) (a due process claim is cognizable only if the plaintiff identifies a constitutionally-

protected liberty or property interest). Additionally, a prisoner's First Amendment right to send

and receive mail may be limited by legitimate penological interests. *Turner*, 482 U.S. at 89.

Finally, plaintiff does not allege that any named defendant was personally involved in or directly

responsible for the alleged mail interference. Liability under § 1983 requires a causal link to, and

direct responsibility for, the alleged deprivation of rights. *Martin v. Sargent*, 780 F.2d 1334,

1338 (8th Cir. 1985) (claim not cognizable under § 1983 where the plaintiff failed to allege that a

defendant was personally involved in or directly responsible for incidents that injured him).

### F.  Denial of Visits with Family

Plaintiff asserts that he was denied visits with his family as a result of "special security orders" for destruction of property. After reviewing the IRRs, grievances and grievance appeals attached to plaintiff's complaint, it appears the destruction of property claim relates to the allegation that plaintiff damaged the sprinkler system inside his cell at 2B-6.

Plaintiff claims that his family informed him that they were told by Functional Unit Manager J. Price of the denial. Plaintiff speculates in a conclusory manner that the visits, in general, denied by Price, Hunter, Turner and Menteer, although it is clear that this is nothing but speculation on plaintiff's part, as he does not state with specificity who denied him his visitation rights on what specific dates. The Court will address this issue as part of plaintiff's procedural due process claims.

### G.  Procedural Due Process Claims

It appears that plaintiff is making two procedural due process claims in his complaint. Plaintiff makes a procedural due process claim with relation to being placed on special security assignment on June 21, 2018. He alleges in a conclusory manner that Jennifer Price placed him on special security assignment without a hearing or notice. Plaintiff does not state how long this "special security assignment" lasted.

The response to plaintiff's informal resolution request regarding the special security orders states that plaintiff was placed on administrative confinement due to his behavior. The response states that the decision was made collectively between "Administrative, Custody, Classification, and Mental Health Personnel." The response states that the orders are "constantly reviewed by Administrative (Warden) and Mental Health Contract Monitors to ensure due process and MODOC policies and procedures were not violated. The response is signed by an Acting Functional Unit Manager, the Assistant Warden and an Investigating Staff Manager.

In the grievance response, Warden Richard Jennings states that plaintiff's assignment to administrative segregation, or special security assignment, was reviewed with respect to Missouri Department of Corrections Guidelines, and it was recommended upon a "collective assessment of mental health, classification, custody and administrative staff." And in the grievance appeal response, Deputy Division Director Jeff Norman indicated that the special security orders were issued as a result of plaintiff's "maladaptive behavior." Conduct violation records indicated that plaintiff received nine conduct violations in 2018, two of which were for assault and two for threats.

Plaintiff does not state what restrictions were imposed by the "special security assignment" that occurred in June of 2018. He does not indicate whether he was restricted to his cell for a certain length of time, whether his mail was restricted at that time, whether his visits were restricted, or whether he was placed in a special unit in the prison or on a special food program. Without these factual assertions the Court is unable to find that plaintiff was subject to an atypical and significant hardship such that he was denied due process with respect to his June 2018 placement on "special security assignment."

With relation to his "special security assignment" after his move to housing unit 2B in April of 2018, plaintiff states that he was subject to "atypical hardship" for three days in his cell in 2B housing unit because he was naked and left without clothing or a smock. Plaintiff alleges that the next thirty (30) days in 2B he lacked furnishings in his cell, didn't have basic hygiene items, was forced to eat bag lunches and he wasn't allowed to shower. He states that this caused him intentional infliction of emotional distress, but he doesn't allege which particular defendant is responsible for such distress. In other words, plaintiff does not allege which defendant is responsible for placing him on special security assignment in Housing Unit 2B and allegedly depriving him of procedural due process.

As to plaintiff's individual capacity claims against defendants, prisoners may claim the protections of the Due Process Clause, and may not be deprived of life, liberty, or property without due process of law. *Haines v. Kerner,* 404 U.S. 519 (1972). However, a procedural due process claim "is cognizable only if there is a recognized liberty or property interest at stake," and courts "need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest." *Beaulieu v. Ludeman,* 690 F.3d 1017, 1047 (8th Cir. 2012) (internal citations omitted).

The Supreme Court has determined that prisoners have a protected liberty interest in avoiding conditions of confinement that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 4 72, 484 (1995); *see also Phillips v. Norris,* 320 F.3d 844, 846-47 (8th Cir. 2003). Therefore, in the case at bar, this Court need only reach the question of what process was due if plaintiff's allegations demonstrate that his placement in disciplinary segregation, administrative segregation, and his temporary visitation restriction created an atypical and significant hardship under *Sandin.* *See Beaulieu,* 690 F.3d at 1047.

Regarding his placement in administrative segregation, plaintiff alleges only that the duration was 3 days without clothing and 30 days without what plaintiff believes to be necessities. He alleges no facts tending to show that the conditions of that confinement imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. Placement in disciplinary segregation does not, in and of itself, amount to an atypical and significant hardship. *See Portley-El v. Brill,* 288 F.3d 1063, 1065 (8th Cir. 2002) (recognizing that the Eighth Circuit has consistently held that disciplinary segregation is not an atypical and significant hardship under *Sandin).* Also, plaintiff cannot demonstrate that 30 days in disciplinary segregation was unduly long. *See Kennedy v. Blankenship,* 100 F.3d 640, 641-42

(8th Cir. 1996) (30 days in punitive isolation was not atypical and significant); *Orr v. Larkins,* 610 F.3d 1032, 1033-34 (8th Cir. 2010) (nine months in disciplinary segregation was not atypical and significant).

Plaintiff also alleges that his visiting privileges were temporarily restricted at some point in time. Plaintiff fails to allege the duration of these restrictions, but he does not allege any facts permitting the conclusion that these restrictions imposed an atypical and significant hardship under *Sandin.*  To state a claim under § 1983 for unconstitutional placement in administrative segregation, a prisoner "must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship."  *Phillips*, 320 F.3d at 847.

Although plaintiff complains that he was given brown bag lunches and that his cell was dirty and he was made to sleep on the floor for a time, he does not provide the Court with the time period this went on or compare this to ordinary life in other prison cells such that he can show an atypical or significant hardship. Moreover, plaintiff has not provided the Court with the name of the person who purportedly ordered that plaintiff remain in administrative segregation and on suicide watch with these measures for this unspecified time period. For these reasons the Court is unable to state that plaintiff has alleged a procedural due process claim relative to his stay in administrative confinement in April 2018.

### H.  Conditions of Confinement Claims

Plaintiff states that he was given poor food between March 12, 2018 and April 18, 2018, consisting of a brown bag diet, which was 2 peanut butter and jelly sandwiches and a cupcake or pack of cookies with juice or water. Plaintiff claims this was issued by defendant Turner or defendants J. Price or Menteer.  Plaintiff states that the security orders indicated that he would

not be allowed property except for a paper smock and brown bag meals, including two sandwiches, a coke or cookie.

Prisoners have a right to receive nutritionally adequate food. *See Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). However, plaintiff has not alleged that he lost weight during the one month time period he was receiving the brown bag lunches, or that they were not nutritionally adequate. Rather, it appears that plaintiff simply does not like the receipt of a brown bag lunch while in administrative segregation. This does not rise to the level of a constitutional violation.

Plaintiff also claims that he was also given inadequate clothing between March 12, 2018 and April 18, 2018, consisting of one pair of boxers. He alleges that on April 18, 2018, he was given a t-shirt and socks, but it was taken by defendant Menteer on an unspecified date by "orders of the CERT Team."

Plaintiff claims that on Tuesday, April 10, 2018, he was for the first time given a toothbrush and toothpaste under the security orders by Correctional Officer Amber Rayfield-Davis. Plaintiff states that Rayfield-Davis said she was providing the toothpaste and toothbrush under orders from the Functional Unit Manager, Jennifer Price.

Plaintiff additionally asserts that there was "inadequate furnishings" in his cell. He claims that he had no mattress, no sheets, no blanket and he was subjected to "harsh conditions." He claims that the cell was colder than normal because it was still "winter," and he was forced to sleep on concrete without a mattress or blanket. Although plaintiff blames defendants Price, Menteer Hunter and Turner for the conditions of confinement, he does not indicate who gave the orders to deprive plaintiff of furnishings in his cell.

Plaintiff alleges that his conditions of confinement in his cell in 2B were constitutionally inadequate under the Eighth Amendment. He states that the concrete slab plaintiff slept on had

dirt on it. Plaintiff also complains that the toilet and sink area also had dirt and "feces" stuck inside the toilet bowl. Plaintiff states that for three days the cell did not have running water except for the sprinkler water he turned on.

The Supreme Court has stated that the "Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 492 U.S. 337, 349 (1981), and that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis" of a § 1983 conditions-of-confinement claim. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "Although the Constitution does not mandate comfortable prisons, inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Whitnack v. Douglas Cty.*, 16 F.3d 954, 957 (8th Cir. 1994) (internal quotation and citations omitted). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991)). "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (quoting *Wilson*, 501 U.S. at 305). "Conditions, such as a filthy cell, may be 'tolerable for a few days and intolerably cruel for weeks or months.'" *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)).

To state a claim for unconstitutional conditions of confinement under the Eighth Amendment, an inmate must show that the alleged deprivations denied him the minimal civilized measure of life's necessities and that defendants were deliberately indifferent to excessive risk to his health or safety. *E.g.,Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995) ("Eighth Amendment does not absolutely bar placing an inmate in a cell without clothes or bedding.").

Liberally construing plaintiff's complaint, the Court finds that plaintiff has stated an Eighth Amendment claim against defendants Menteer, Jennifer Price and defendant Turner, the persons he alleges signed the security orders depriving him of proper clothing and a bed and blanket, as well as proper hygiene items, in his cell for approximately a month between March and April 2018. The Court will issue process on these claims against these defendants in their individual capacity only. Plaintiff's claims against these defendants and the remaining defendants in their official capacities, however, are subject to dismissal, as they are MDOC employees. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). "[N]either a State nor its officials acting in their official capacity are 'persons' under § 1983." *Id.*

## I. Religious Discrimination Claim

Plaintiff asserts that he was denied the ability to practice his unnamed religion, as well as his unnamed certified religious diet, between March 13, 2018 and April 18, 2018. Plaintiff has not indicated whether he is bringing his claim pursuant to the First Amendment or pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. 2000cc, *et seq.*

While prisoners retain their constitutional rights, they are subject to limitations on those rights "in light of the needs of the penal system." *Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 982 (8th Cir.), cert. denied, 543 U.S. 991 (2004).* An inmate's constitutional claims are evaluated under a lesser standard of scrutiny, even though such claims would receive strict scrutiny analysis if brought by a member of the general population. *Id.* "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

A prisoner's claim under RLUIPA is evaluated under a different standard than a First Amendment claim. "By enacting RLUIPA, Congress established a statutory free exercise claim

encompassing a higher standard of review than that which applies to constitutional free exercise claims." *Murphy*, 372 F.3d at 987 (8th Cir. 2004).

Unfortunately, as stated above, plaintiff has failed to identify what religion he was practicing or how he was denied his requested religious diet. Therefore, he cannot state a claim under either RLUIPA or the First Amendment for religious discrimination.

## J. Grievance Claims

Plaintiff asserts that "in mid-May [he] tried to file several IRRs about the conditions of confinement in the SSO's to no avail." He claims that Caseworker J. Jones chose to file two different IRRs for plaintiff but would not process the IRRs on excessive force or on the conditions at the special security orders. He alleges that it wasn't until he was assigned a new caseworker that he was able to file the appropriate IRRs.[5] Plaintiff has provided the Court with a copy of a grievance response indicating that there were, in fact, two grievances that were unfortunately not processed by the Missouri Department of Corrections in a timely manner. The grievance response notes that the response provided at the IRR level on August 10, 2018, encouraged plaintiff to utilize the IRR process for any complaints which he had regarding the processing of his IRRs. The grievance response noted that in the nearly sixty (60) days after that time, plaintiff had not pursued any old issues and a new case manager had been assigned to plaintiff's housing unit.

To the extent plaintiff can be understood to claim that defendant J. Price responded inappropriately to his grievance or his grievance appeal, such allegations do not state a claim of constitutional dimension. *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (prison

---

[5]Plaintiff has attached several IRRs, grievances, grievance responses, grievance appeals, and grievance appeal responses to his complaint. The Court will review these documents as part of the complaint in compliance with Fed.R.Civ.P.10(c).

official's failure to process or investigate grievances, without more, is not actionable under § 1983; grievance procedure is procedural right only and confers no substantive right on inmate).

### K.  Conclusion

The majority of plaintiff's claims fail to state a claim or seek relief from defendants in their official capacities, and so no process will issue on those claims.  The claims that survive frivolity review under 28 U.S.C. § 1915 are as follows:

1. Claims against defendants Jennifer Price, Captain John Doe Menteer and Jeffrey Turner in their individual capacities for purported unlawful conditions of confinement under the Eighth Amendment, for failing to provide plaintiff with proper clothing, a mattress, proper bedding, and proper hygiene items between mid-March and mid-April 2018;

2. The claim against defendant John Dayton Richey, in his individual capacity, for alleged excessive force, in violation of the Eighth Amendment, for purportedly punching plaintiff in the mouth on or about March 12, 2018; and

3. The claim against defendant Jeremiah Kitchell, in his individual capacity, for alleged excessive force, in violation of the Eighth Amendment, for purportedly punching plaintiff in the head and facial area on or about April 13, 2018.

### Motion for Appointment of Counsel

Finally, plaintiff has filed a motion for appointment of counsel.  The appointment of counsel for an indigent plaintiff in a civil matter lies within the discretion of the Court.  *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006).  There is no constitutional or statutory right to appointed counsel in civil cases.  *Nelson v. Redfield Lithograph Printing*, 728 F.2d 1003, 1004 (8th Cir. 1984).  Once the plaintiff has alleged a prima facie claim, the Court must determine the plaintiff's need for counsel to effectively litigate his claim.  *In re Lane*, 801 F.2d

1040, 1043 (8th Cir. 1986). The standard for appointment of counsel in a civil case is whether both the plaintiff and the Court would benefit from the assistance of counsel. *Edgington v. Mo. Dep't of Corr.*, 52 F.3d 777, 780 (8th Cir. 1995), abrogated on other grounds, *Doe v. Cassel*, 403 F.3d 986, 989 (8th Cir. 2005). This determination involves the consideration of several relevant criteria, including "the factual complexity of the issues, the ability of the indigent person to investigate the facts, the existence of conflicting testimony, the ability of the indigent person to present the claims, and the complexity of the legal arguments." *Phillips*, 437 F.3d at 794 (citing *Edgington*, 52 F.3d at 780).

In this matter, the Court finds that appointment of counsel is not warranted at this time. The action appears to involve straightforward questions of fact rather than complex questions of law, and plaintiff appears able to clearly present and investigate his claims. He has filed an articulate and readily understood pleading which indicates that he is capable of clear expression and appropriate organization of content. Further, the request for counsel is premature, as defendants have not yet been served, and the Court has not issued any Case Management Order. The Court concludes that the appointment of counsel would not be of sufficient benefit to the Court or to plaintiff at this time, and will deny plaintiff's motion for appointment of counsel, without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to proceed in forma pauperis [Doc. #2] is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff shall pay an initial filing fee of $7.61 within thirty (30) days of the date of this Order. Plaintiff is instructed to make his remittance payable to "Clerk, United States District Court," and to include upon it: (1) his name; (2) his

prison registration number; (3) the case number; and (4) that the remittance is for an original proceeding.

**IT IS FURTHER ORDERED** that if plaintiff fails to pay the initial partial filing fee within thirty (30) days of the date of this Order, then this case will be dismissed without prejudice.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to defendants Jennifer Price, Captain John Doe Menteer and Jeffrey Turner, in their individual capacities, for purported unlawful conditions of confinement under the Eighth Amendment, for failing to provide plaintiff with proper clothing, a mattress, proper bedding, and proper hygiene items between mid-March and mid-April 2018. These defendants, who worked at Potosi Correctional Center in 2018, may be served through the Court's waiver agreement with the Missouri Attorney General's Office.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to defendant John Dayton Richey, in his individual capacity, for alleged excessive force, in violation of the Eighth Amendment, for purportedly punching plaintiff in the mouth on or about March 12, 2018. This defendant, who worked at Potosi Correctional Center in 2018, may be served through the Court's waiver agreement with the Missouri Attorney General's Office.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to defendant Jeremiah Kitchell, in his individual capacity, for alleged excessive force, in violation of the Eighth Amendment, for purportedly punching plaintiff in the head and facial area on or about April 13, 2018. This defendant, who worked at Potosi Correctional Center in 2018, may be served through the Court's waiver agreement with the Missouri Attorney General's Office.

**IT IS FURTHER ORDERED** that, pursuant to 42 U.S.C. § 1997e(g)(2), defendants Jennifer Price, Captain John Doe Menteer, Jeffrey Turner, John Dayton Richey and Jeremiah Kitchell shall reply to plaintiff's claims within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that the Clerk shall not issue process or cause process to issue upon the complaint as to defendants Travis Crews, John Doe Hunter, Tracey Price, John Parsons, Christine Mezo, Christine Henson, Kyle Kershaw, Jane Doe Skaggs, Charles Conrad, Steven Brook, John Doe Demeart, John Doe Mesberg, John Doe Bertlesmeyer, Amber Rayfield-Davis, Timothy Poole, Jeffrey Jones, Tracy Dunn, Robin Billin and Daly Smith, because, as to these defendants, the complaint is legally frivolous or fails to state a claim upon which relief can be granted, or both.

**IT IS FURTHER ORDERED** that the Clerk shall not issue process or cause process to issue upon the complaint as to plaintiff's claims against defendants Jennifer Price, Captain John Doe Menteer, Jeffrey Turner, John Dayton Richey and Jeremiah Kitchell in their official capacities, because these claims are subject to dismissal for failure to state a claim upon which relief may be granted.

**IT IS FURTHER ORDERED** that plaintiff's motion for appointment of counsel [Doc. #4] is **DENIED at this time.**

**IT IS FURTHER ORDERED** that this case is assigned to Track 5B: Prisoner Standard.

An Order of Partial Dismissal will accompany this Memorandum and Order.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2020.